851 F.2d 1321
 57 USLW 2101
 Samuel JONES, Jr., Plaintiff-Appellant,
v.
PREUIT & MAULDIN, a partnership composed of E.F. Mauldin,
individually, and E.F. Mauldin as Executor or Administrator
of the Estate of Leonard Preuit, Deceased; E.F. Mauldin, as
Executor or Administrator of the Estate of Leonard Preuit,
deceased; and Preuit Mauldin, Defendants-Appellees.
 No. 86-7415.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 10, 1988.
 
 Burr & Forman, C.V. Stelzenmuller, F.A. Flowers, III, Birmingham, Ala., for plaintiff-appellant.
 Potts, Young, Blasingame & Putnam, Robert W. Beasley, Florence, Ala., Don Siegelman, Atty. Gen. of Ala., Ronald C. Forehand, Asst. Atty. Gen., Montgomery, Ala., Robert M. Weinberg, Bradley, Arant, Rose & White, David G. Hymer, Donald M. James, Birmingham, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before RONEY, Chief Judge, and TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON and COX, Circuit Judges.
 HILL, Circuit Judge:
 
 
 1
 This case involves the question of whether qualified immunity may be asserted by private individuals who are defendants in an action under 42 U.S.C. Sec. 1983, and, if so, whether the defendants in this case are entitled to qualified immunity. A panel of this court issued an original opinion, 808 F.2d 1435 (1987), and a later opinion on rehearing, 822 F.2d 998 (1987). The two opinions concluded that qualified immunity is available to such defendants, but, on disposition of the case, came to different results. We have taken the case in banc to examine and resolve the issues. We find that private individuals may assert a good faith immunity defense in a section 1983 action, and that these defendants have established a claim to such immunity.
 
 I. FACTS
 
 2
 Samuel Jones, the plaintiff, was a cotton farmer in Alabama in 1981. He produced his own crop and, using his mechanical cotton picking equipment, harvested cotton for others. In July of that year, Jones employed Preuit and Mauldin (P & M) to repair three of his cotton pickers. P & M deals in and services International Harvester cotton pickers. The total cost of the repairs was over $10,000, and Jones represented that he would pay for the repairs out of the proceeds from his harvesting work during the coming fall season.
 
 
 3
 In February of 1982, the repair bill had not been paid, in part because Jones also owed money to the Farmers Home Administration (FHA) and checks he received for his cotton were made out jointly to Jones and the FHA. After repeated efforts to have Jones pay, P & M's manager, Preuit Mauldin, contacted an attorney, D.L. Martin, about the possibility of collecting on the debt.
 
 
 4
 Alabama law provides equipment repairers with a mechanic's lien against vehicles upon which they perform work. Ala.Code Sec. 35-11-110 (1975). Equipment of the kind involved here is subject to such a lien. P & M's attorney thus prepared documents and pleadings necessary to file an action to foreclose the liens asserted by P & M against Jones' three cotton pickers. In addition, he prepared an application for writs of attachment as provided for under Alabama law. Ala.Code Sec. 35-11-111. The pleadings and documents named Jones' other creditors as involuntary plaintiffs because they had potential interests in the cotton pickers.[1]
 
 
 5
 On February 15, 1982 P & M filed three separate actions in the Circuit Court of Laurence County, Alabama to foreclose on the mechanic's liens against Jones' three cotton pickers. At the same time P & M filed the affidavits for attachment of the equipment and bonds to secure Jones against a wrongful attachment. It is not disputed that the attachment proceedings were in conformity with Alabama law. While the state law appears to allow a clerk of court to issue the writ of attachment (Ala.Code Sec. 6-6-43), these affidavits were presented to the judge of the circuit court, who authorized the issuance of a writ for each of the three pieces of equipment.
 
 
 6
 Jones was served with process in the lien foreclosure actions on April 8, 1982 and, on the same day, the writs of attachment were executed upon the equipment which was thereafter stored by the sheriff. Further, on that day, two of the involuntary plaintiffs filed a motion for dissolution of the writ and requested a hearing. Jones did not join in this motion.[2] Jones also failed to respond to the summons and complaint in the three foreclosure actions, and a default judgment was entered against him on May 19, 1982.[3]
 
 
 7
 The circuit court held a hearing on the involuntary plaintiffs' motion for dissolution on June 15, 1982. The hearing involved the relative priority of P & M's liens as against the claims of the other, involuntary, plaintiffs. Jones did not appear as an interested party at the hearing, but, as a witness, he testified for Citizens Bank as to the bank's interest in his equipment. His testimony supported the bank's position. On July 2, 1982 the judge denied the motion for dissolution,[4] confirmed the default judgments, and ordered the cotton pickers sold. The equipment was ultimately sold at auction on September 13, 1982.
 
 
 8
 Jones first took formal action as a party in court in this case on August 16, 1983 when he filed a motion pursuant to Rule 65.1 of the Alabama Rules of Civil Procedure seeking a forfeiture of P & M's attachment bond.[5] He alleged that the attachment was wrongful, vexatious, and without legal authority. A hearing was held, and the motion was denied on November 29, 1983. Jones apparently took no further action in state court.[6]
 
 
 9
 Jones filed the present action in federal district court on February 24, 1984. In his complaint under 42 U.S.C. Sec. 1983 Jones alleged that the prejudgment seizure of his cotton pickers violated his rights under the due process clause of the Fourteenth Amendment. The district court initially dismissed the suit as barred by the applicable statute of limitations, but a panel of this court reversed that decision. 763 F.2d 1250 (11th Cir.1985). Subsequently, Jones moved for partial summary judgment seeking a declaration that the Alabama attachment procedure was unconstitutional. The defendants then moved for summary judgment on Jones' section 1983 claims. The district court denied Jones' motion and granted summary judgment in favor of the defendants.
 
 II. DISCUSSION
 A. Qualified Immunity
 
 10
 The district court found that P & M acted in good faith reliance upon laws which were not clearly unconstitutional. This finding raises the question of whether private defendants in a section 1983 action are entitled to assert the defense of qualified immunity. If they are, private defendants would be free from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Stated otherwise, immunity attaches unless the defendants reasonably should have known that their actions violated clearly established constitutional rights. Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 396 (1982). The Supreme Court held that private defendants may be subject to liability under section 1983 in Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The Court, however, expressly reserved the question of whether such defendants are entitled to qualified immunity. Id. at 942 n. 23, 102 S.Ct. at 2756 n. 23.[7] We find that private defendants are entitled to a defense of qualified immunity in wrongful attachment actions under section 1983.
 
 
 11
 While section 1983 itself is silent as to immunities, the Supreme Court has held that the provision incorporates immunities which were well established at common law and which are consistent with the purposes of the statute. Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); Pierson v. Ray, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 1217-18, 18 L.Ed.2d 288 (1967).[8] Thus, we must determine whether the good faith reliance on law claimed here was well established as a defense at common law and whether strong policy reasons support its application in section 1983 actions. Two of our fellow circuits have undertaken this analysis and have held that qualified immunity attaches to private defendants under section 1983. See Buller v. Buechler, 706 F.2d 844, 850-53 (8th Cir.1983); Folsom Investment Co. v. Moore, 681 F.2d 1032, 1037-38 (5th Cir. Unit A 1982). Two other circuits have held that private defendants are not entitled to qualified immunity. See Downs v. Sawtelle, 574 F.2d 1 (1st Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); Howerton v. Gabica, 708 F.2d 380, 385 n. 10 (9th Cir.1983).
 
 
 12
 At the time of section 1983's enactment, the common law provided an action for the tort of malicious prosecution, which was used as a remedy for wrongful attachment. Some jurisdictions also recognized an independent tort of wrongful attachment. The plaintiffs in such suits were required to prove that the attachment proceedings had been instituted by defendants with malice and without probable cause. Buller, 706 F.2d at 851; Folsom Investment Co., 681 F.2d at 1038. See also W. Prosser, Handbook of the Law of Torts, Sec. 120 (4th ed. 1971). By requiring proof of malice and lack of probable cause as an element of the claim, the common law recognized a defense of good faith and probable cause in wrongful attachment suits. The Supreme Court has held that the existence of a defense of good faith and probable cause at common law supports the availability of qualified immunity in present day section 1983 suits. See Wood v. Strickland, 420 U.S. 308, 318-19, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975) (liability of public school officials under state tort law for malicious acts only establishes good faith immunity under section 1983); Pierson, 386 U.S. at 555-57, 87 S.Ct. at 1218-19 (police officers entitled to good faith immunity under section 1983 where good faith and probable cause were a defense in common law suits for false arrest or false imprisonment). Thus, the existence of a good faith and probable cause defense in common law actions for wrongful attachment supports a finding that qualified immunity is available to a private defendant in a section 1983 suit.
 
 
 13
 We turn then to the policy reasons supporting the availability of qualified immunity. Public officials have been accorded immunity in order to ensure a willing supply of public servants. Similarly powerful policy considerations support granting qualified immunity to private individuals in wrongful attachment suits. When a citizen undertakes in good faith to utilize a proceeding at law provided by his state legislature, he should do so with confidence that he need not fear liability resulting from the legislature's constitutional error of which he was unaware. Indeed, our system encourages citizens to employ existing lawful mechanisms to resolve their claims and disputes. What we encourage we ought not seek to punish. In the same way that we wish to encourage citizens to undertake public service, so must we encourage them to settle their differences and assert their claimed rights through the employment of legal mechanisms which they believe, in good faith, are constitutional.
 
 
 14
 The opportunity to employ extant legal procedures is not, however, without limits. The available immunity is thus qualified by the requirement that the defendant must act in good faith. More specifically, in the present context the defendant is immune unless he knew or reasonably should have known that his actions violated clearly established constitutional rights. This qualification preserves the full deterrent force of section 1983 by excluding from liability only those who could not reasonably have known that their conduct violated the federal constitution. No additional deterrence can be achieved by punishing individuals who could not reasonably have known that their actions were improper. Moreover, when an individual takes action that he should know violates constitutional rights, the individual is not immune. We thus find that strong policy considerations support the availability of qualified immunity for private defendants.
 
 
 15
 Providing private citizens with qualified immunity is also supported by the general development of section 1983 law. Prior to Lugar, the elements of a 1983 claim and the available defenses were addressed in terms of state officers, agents, or employees as defendants. The Supreme Court found that such public defendants were entitled to various types of immunity. See e.g., Wood, 420 U.S. at 318-19, 95 S.Ct. at 999; Pierson, 386 U.S. at 555-57, 87 S.Ct. at 1218-19. Section 1983 provides for claims to redress only state action, and prior to Lugar private individuals were not considered proper defendants in such suits. Lugar thus represents a significant change in the course of section 1983 law in that it renders private citizens liable as state actors for constitutional violations. The holding in Lugar is premised, however, on the finding that, in certain circumstances, private individuals may be equated with public actors for section 1983 purposes. Since Lugar rests on the premise that private and public actors may sometimes be equated, there is little reason to deny to private defendants the type of immunity which has been granted to public defendants. Indeed, the logic of Lugar compels the conclusion that while private individuals may sometimes be liable equally with public defendants under section 1983, they should never be held more liable. To deny private individuals such immunity as public actors enjoy would render private individuals more liable than public actors. This result would be inconsistent with Lugar. We therefore hold that private defendants are entitled to qualified immunity in wrongful attachment suits under section 1983.[9]B. P & M's Qualified Immunity
 
 
 16
 Having determined that private defendants are entitled to qualified immunity in wrongful attachment actions under section 1983, we must now address whether P & M acted in good faith and is therefore not liable. More specifically, our inquiry is whether P & M reasonably should have known that its actions violated Jones' clearly established constitutional rights. This inquiry requires an objective analysis of the law as it existed at the time of P & M's action. See Anderson, 107 S.Ct. at 3038 (The inquiry "turns on the 'objective legal reasonableness' of the action."). It is therefore a question of law.
 
 
 17
 Jones contends that in 1982 he had a clearly established right to notice and a hearing before his property could be attached. In addressing this contention we must evaluate the constitutional jurisprudence extant at the time that his property was attached. There were four Supreme Court cases on the books in 1982 dealing directly with the constitutionality of attachment provisions.
 
 
 18
 In Sniadach v. Family Finance Corporation of Bay View, 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969), the Supreme court struck down a Wisconsin statute which authorized the prejudgment garnishment of wages, which the court noted were "a specialized type of property presenting distinct problems in our economic system." The statute did not provide for pregarnishment notice or a hearing. Furthermore, the creditor could garnish the debtor's wages without demonstrating a lien or prior interest in the property attached, and the attachment could be accomplished without judicial supervision. In the absence of more restrictive safeguards, the Court held the statute unconstitutional for failure to provide pregarnishment notice and a hearing.
 
 
 19
 The Supreme Court then struck down the replevin statutes of Florida and Pennsylvania in Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). These provisions suffered from several fatal inadequacies. First, they authorized a seller of goods to obtain repossession of their wares without judicial order or participation. Second, the writ could be issued by a court clerk on "the bare assertion of the party seeking the writ that he is entitled to one." Id. at 74, 92 S.Ct. at 1991. And finally, the debtor's only post-deprivation remedy was the potential to be heard as the defendant if the creditor commenced an action to determine his rights to repossession. Given these procedural inadequacies, in addition to the absence of preseizure notice and a hearing, the court declared both statutes unconstitutional.
 
 
 20
 The pathway along which the Supreme Court had been travelling in Sniadach and Fuentes took an abrupt turn when, in Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the Court upheld a Louisiana sequestration provision which allowed attachment without preseizure notice or a hearing. The opinion so limited the principles enunciated in Fuentes that several Justices concluded that Fuentes was essentially overruled. See 416 U.S. at 623, 94 S.Ct. at 1908 (Powell, J., concurring) ("I think it fair to say that the Fuentes opinion is overruled."); 416 U.S. at 635, 94 S.Ct. at 1913 (Stewart, J., dissenting) ("[T]he court today has unmistakably overruled a considered decision of this court that is barely two years old, without pointing to any change in either societal perceptions or basic constitutional understandings that might justify this total disregard of stare decisis."). Nevertheless, the Court distinguished the Louisiana provision from the statutes struck down in Fuentes, and found that the Louisiana law was redeemed by several alternative safeguards. First, the writ of sequestration was authorized " 'only when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts' shown by verified petition or affidavit." Mitchell, 416 U.S. at 616, 94 S.Ct. at 1904. Second, in the particular district involved, the requisite showing had to be made to a judge, and only a judge was authorized to issue the writ. Id. Third, the statute provided that "[t]he defendant by contradictory motion may obtain the dissolution of a writ of attachment or of sequestration, unless the plaintiff proves the grounds upon which the writ was issued." Id. at 622, 94 S.Ct. at 1907. The Supreme Court interpreted this section to provide for an immediate hearing to determine whether the writ was appropriately issued. Id. at 618, 94 S.Ct. at 1905. Finally, the debtor was protected by a provision in the statute which allowed for damages for wrongful issuance of the writ, and for attorneys' fees, "whether the writ is dissolved on motion or after trial on the merits." Id. at 617, 94 S.Ct. at 1905.[10]
 
 
 21
 In the fourth Supreme Court case, North Georgia Finishing v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), the court struck down a Georgia attachment statute which did not provide several of the safeguards approved of in Mitchell. First, the Georgia law provided the following with respect to the affidavits: "[t]he writ of garnishment is issuable on the affidavit of the creditor or his attorney, and the latter need not have personal knowledge of the facts. The affidavit, like the one filed in this case, need only contain conclusory allegations." Id. at 607 (citation omitted). Second, the writ could be issued by a court clerk without judicial participation. Id. Finally, the debtor could dissolve the garnishment only by filing a bond to protect the creditor, and there was no provision for a prompt post-seizure hearing at which the creditor would be required to demonstrate the grounds upon which the writ was issued. Id. Without such alternative safeguards, the statute was held unconstitutional for failure to provide preseizure notice and a hearing.
 
 
 22
 Having traversed this somewhat tangled trail of Supreme Court cases, we cannot say that P & M should have known that it was violating any clearly established constitutional rights. The Supreme Court justices themselves strained to reconcile Fuentes, Mitchell and Di-Chem, and in a case such as the present one, where the creditor's actions fall somewhere in the interstice, a reasonable person would have been hard put to identify any clearly established constitutional rights or violations. As the Supreme Court has stated, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in light of preexisting law the unlawfulness must be apparent." Anderson, 107 S.Ct. at 3039. Under a qualified immunity analysis, of course, we need not rule upon the actual constitutional validity or invalidity of the creditor's actions or of the state statute under which he proceeded. We need only examine whether the creditor should have known that the actions violated clearly established constitutional rights. Thus, so long as P & M's actions were arguably commensurate with the protections approved of in Mitchell, P & M is entitled to good faith immunity.
 
 
 23
 P & M's actions included the following. First, P & M presented a sworn affidavit indicating the specific facts entitling P & M to an attachment of Jones' equipment. The affidavit was made upon personal knowledge and it indicated that Jones was justly indebted to P & M in a specific amount for labor and materials; that Jones had failed to pay for the repairs after lawful demand; and that the attachment was not for the purpose of vexing or harassing Jones. Second, P & M presented the applications to a judge and it was the judge who authorized the writ. Third, Jones was properly served and notified of the attachment. Fourth, P & M posted bonds to protect Jones against loss due to wrongful attachment. Finally, Alabama law provided Jones with an opportunity to challenge the attachment in a timely manner.[11] Based upon this record, we cannot say that P & M should have known that its actions violated Jones' clearly established constitutional rights. P & M's efforts were arguably commensurate with the safeguards required by Mitchell. At best, one may argue that P & M's actions fall somewhere in the nebulous area that lies between Mitchell and Di-Chem. In either case, however, a reasonable person could have believed that the actions were constitutional. We do not hold that P & M's actions were constitutional, but only that the actions did not violate clearly established constitutional rights of which a reasonable person should have known. P & M is thus entitled to immunity insofar as the seizure of Jones' cotton pickers may have violated his constitutional rights.[12]
 
 C. Declaratory Relief
 
 24
 Jones also moved the district court for a partial summary judgment declaring the Alabama attachment statute unconstitutional. The district court denied the motion, and Jones now contends that this was an abuse of discretion. We readily agree with Jones that the Alabama statute stands on highly questionable constitutional footing insofar as it authorizes a nonjudicial officer to issue a writ of attachment. See Ala.Code Sec. 6-6-43.[13] This authorization may indeed be contrary to Mitchell 's mandate that judicial control exist in order "to minimize the risk that the ex parte procedure will lead to a wrongful taking." 416 U.S. at 616-17, 94 S.Ct. at 1905. See also Johnson v. American Credit Co., 581 F.2d 526, 534 (5th Cir. Unit A 1978) (writ must be issued by a judge with discretion to deny the writ).[14]
 
 
 25
 It is clear, however, that Jones was not affected by the portion of the law which authorizes nonjudicial officers to issue writs of attachment. P & M presented its application to a circuit court judge, and the judge authorized the issuance of the writs of attachment against Jones' equipment. Hence, Jones lacks standing to challenge the offensive portion of the law, and we do not hold the law invalid.[15] When a plaintiff seeks a declaratory judgment that a state statute is unconstitutional, the requirements for standing must be strictly enforced. See Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965). We may not declare a law unconstitutional based upon hypothetical situations which have not, in fact, occurred. See County Court of Ulster County v. Allen, 442 U.S. 140, 155-56, 99 S.Ct. 2213, 2223-24, 60 L.Ed.2d 777 (1979). Because Jones lacks standing to challenge the portion of the Alabama law which authorizes court clerks to issue writs of attachment, he is not entitled to a declaration of the law's unconstitutionality. We therefore affirm the district court's denial of Jones' motion for partial summary judgment.
 
 III. CONCLUSION
 
 26
 For the foregoing reasons, the decision of the district court is
 
 
 27
 AFFIRMED.
 
 TJOFLAT, Circuit Judge, specially concurring:
 I.
 
 28
 I concur in the result reached by the majority, but I would reach that result by way of a different route. The majority holds that the defendants in this case are immune from damages, and therefore does not reach the merits of the plaintiff's claim. I would find it unnecessary even to reach the immunity question. In my opinion, the defendants cannot be deemed, under the undisputed facts of this case, to have caused the injury alleged by the plaintiff. Because the crucial element of causation is absent, no liability under 42 U.S.C. Sec. 1983 (1982) can run against the defendants.
 
 
 29
 I begin with a brief review of the facts. Samuel Jones owed Preuit & Mauldin (P & M) a debt arising from P & M's repair work on three of Jones' cotton pickers. The debt went unpaid, and P & M's manager retained an attorney, David L. Martin, to collect on the debt. Alabama law gives equipment repairers like P & M a mechanic's lien against equipment upon which they make repairs. The attorney accordingly brought three actions to foreclose P & M's liens on Jones' three cotton pickers. At the same time, the attorney prepared applications under Ala.Code Sec. 35-11-111 (1975) for three writs of attachment, one for each of the cotton pickers, and presented the applications to a state circuit court judge. The judge directed the issuance of the writs, and the sheriff seized the cotton pickers. Subsequently, the same judge entered a default judgment against Jones in the foreclosure actions.
 
 
 30
 It is the procedure the circuit court judge followed in issuing the writs of attachment that Jones alleges deprived him of his fourteenth amendment right to due process. His suit for damages under section 1983, however, was brought not against the judge who issued the writs of attachment. Nor was it brought against the attorney who filed the applications for the writs. Rather, it was brought against P & M, two of its principals, and one of its employees,[1] whose involvement in the matter was limited to retaining an attorney for the purpose of finding a way to collect on the debt owed by Jones.
 
 
 31
 I will for the sake of argument make two assumptions. First, I will assume that the procedure used to effect the attachments was infirm on due process grounds. Second, I will assume that the circuit court judge who issued the writs performed a purely ministerial act. I make the second assumption only because it is not clear from the record exactly what the judge did, aside from ordering the clerk to issue the writs. If he exercised independent judicial discretion in entering the order, a serious question would arise as to whether his involvement in the matter broke the causal link between the attorney's application for the writs and the ultimate seizure of the cotton pickers.[2] But I will assume that what the circuit court judge did was purely ministerial, and that the chain of causation between the attorney's application for the writs and the seizure of the cotton pickers therefore remained unbroken. Even with these two assumptions, I would hold that, under the undisputed facts of this case, no section 1983 liability can run against the defendants.
 
 
 32
 The language of section 1983 "plainly requires proof of an affirmative causal connection" between the actions taken by the defendant and the constitutional deprivation.[3] Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); see also Monell v. Department of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). In Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), the Supreme Court stated that section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Accordingly, we must apply common law principles of causation to determine whether the defendants in this case can be held liable under section 1983.
 
 
 33
 The common law analogy to the constitutional tort involved in this case is the tort of malicious prosecution, which is used as a remedy for wrongful attachment. See W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on the Law of Torts Sec. 120, at 890 & n. 14 (5th ed. 1984). Common law courts have almost universally held that the defendant in such an action may raise, as a complete defense, his reliance on an attorney's advice in instituting the allegedly malicious prosecution. Id. at 878, 894. That rule is essentially a statement about causation: if a layperson elicits the aid of an attorney in achieving a general legal end, and the attorney directs the client along a particular legal avenue which ultimately results in injury to a third party, the client himself will not be held to have caused the third party's injury. Rather, the common law recognizes that the client quite justifiably relied on the attorney's advice.
 
 
 34
 In this case, the district court expressly stated that "undisputed evidence" showed that the defendants "relied upon their attorney, who prepared all of the papers and determined the steps to be followed [with respect to the attachments]." Jones v. Preuit & Mauldin, 634 F.Supp. 1520, 1528 (N.D.Ala.1986). Indeed, Edward Mauldin and Leonard Preuit Mauldin[4] "were completely unaware that the attachments were being sought." Id. In light of these facts, and in light of the common law principles of causation that we must apply, I fail to see how the defendants can possibly be deemed to have caused the injury allegedly suffered by Jones. The defendants are in the same position as the defendant in a common law action for malicious prosecution who relied on the advice of an attorney.[5] If anyone caused Jones to suffer injury, it was either P & M's attorney or the circuit court judge who issued the writs.[6] Thus, I would hold that Jones' section 1983 claim against the defendants necessarily fails because, under the undisputed facts of this case, Jones cannot establish the crucial element of causation.[7]II.
 
 
 35
 As I stated above, were I writing for the majority I would find it unnecessary to reach the immunity issue. In my opinion, that issue becomes relevant only if we assume that both the judge[8] and P & M's attorney played purely ministerial roles in the application for and the issuance of the writs of attachment. As I have noted, the undisputed evidence in this case shows that the attorney did not play a ministerial role.[9] Yet one would have to assume that he did before one could sensibly ask whether the defendants are entitled to assert a good faith defense. For unless we assume that they, and not their attorney, "called the shots" in applying for the writs of attachment, it makes no sense to ask whether "their conduct ... violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."[10]
 
 
 36
 If in fact P & M's attorney had played only a ministerial role, with the result that the defendants could legally be held to have caused the plaintiff's alleged injury, I would be willing to hold along with the majority that the defendants can assert a qualified immunity defense. Before extending official immunity law in this manner, however, I think that we should clarify the nature of our undertaking.
 
 
 37
 It seems to me that immunity law must derive from one of three possible sources: the Constitution, section 1983 itself, or the inherent power of federal courts to fashion remedies for constitutional wrongs. The first possibility can be ruled out at the outset: the Supreme Court has specifically stated that immunity law is not rooted in the Constitution. See Butz v. Economou, 438 U.S. 478, 497, 98 S.Ct. 2894, 2906, 57 L.Ed.2d 895 (1978).[11] The second possibility seems attractive; by employing a fiction, one might say that immunity law is statutorily rooted in that Congress, when it passed the Civil Rights Act of 1871, intended to incorporate all immunities then recognized at common law. Indeed, this statutory interpretation of immunity law is apparently the interpretation embraced by the Supreme Court in various pronouncements on the subject. See, e.g., Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). My review of all the case law, however, compels me to conclude that the third source--the federal courts' inherent power to fashion just remedies for constitutional wrongs--is the source that ultimately shapes the contours of immunity law.
 
 
 38
 For analytical purposes, it is useful to begin by examining the development of immunity law in Bivens-type cases, where the suit for money damages is a direct claim under the Constitution. In Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the plaintiff alleged that federal agents had violated his fourth amendment rights, and that he was entitled to monetary damages for the injury he suffered. Of course, Bivens could not travel under section 1983, because the federal agents had not acted "under color of" state law; instead, he brought his claim for monetary relief directly under the fourth amendment.
 
 
 39
 The Supreme Court held that 28 U.S.C. Sec. 1331 (1982), the statute that grants federal question jurisdiction, provided the district court not only the authority to entertain Bivens' suit, see Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 999 (1946), but also the authority to fashion an appropriate remedy to vindicate the constitutional wrong alleged. In the words of the Court, "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Bivens, 403 U.S. at 396, 91 S.Ct. at 2004 (emphasis added). The Court then decided that money damages were an appropriate remedy for the injury suffered by Bivens, given that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." Id. at 395, 91 S.Ct. at 2004.
 
 
 40
 In essence, federal courts in Bivens cases "make the kind of remedial determination that is appropriate for a common-law tribunal." Bush v. Lucas, 462 U.S. 367, 378, 103 S.Ct. 2404, 2411, 76 L.Ed.2d 648 (1983). Congress may provide for an alternative remedy, thus indicating its intent that the courts' inherent remedial power should not be exercised. Id. Absent an indication of that sort, however, and absent "special factors counselling hesitation," see, e.g., Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), a federal court in a Bivens case will exercise its inherent power to fashion remedies for constitutional wrongs.[12] In meeting that task, "the range of policy considerations [the courts] may take into account is at least as broad as the range of those a legislature would consider with respect to an express[ed] statutory authorization of a traditional remedy." Bivens, 403 U.S. at 407, 91 S.Ct. at 2010 (Harlan, J., concurring).
 
 
 41
 The recognition of official immunities in Bivens cases should be viewed as nothing more than one aspect of this species of remedial determination by federal courts. In deciding how the remedy in a Bivens case should be influenced by the application of official immunity doctrines, the Supreme Court has attempted to accommodate competing values, balancing the values served by vindicating constitutional rights through the award of money damages against the societal costs that result from holding the particular defendant liable for such damages. See, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 814-15, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). The Supreme Court has specifically acknowledged that "the law of privilege as a defense to damages actions against officers of Government has 'in large part been of judicial making.' " Butz v. Economou, 438 U.S. 478, 501-02, 98 S.Ct. 2894, 2908, 57 L.Ed.2d 895 (1978).
 
 
 42
 It is against this background that immunity law in the section 1983 context should be analyzed.[13] As in the Bivens context, Congress has said nothing in the section 1983 context about immunities. Presumably, federal courts are to fill the vacuum themselves, just as they do with respect to immunity law in Bivens cases. Thus, when the Supreme Court says that Congress did not intend to abrogate all common law immunities when it enacted section 1983, see, e.g., Procunier v. Navarette, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978), I interpret the Court to be saying that federal courts remain free, as they are in the Bivens context, to apply their inherent remedial powers to fashion a body of immunity law that justly accommodates competing interests.[14]
 
 
 43
 I perceive no other way to explain satisfactorily the case law concerning section 1983 immunities. As noted above, one might say that immunity law is strictly statutorily based; the statutory argument would be that when Congress passed the Civil Rights Act of 1871, it intended to incorporate those immunities then recognized at common law. Under that analysis, however, fairness concerns would never enter the picture--our task would be limited to a mechanical determination of the state of immunity law in 1871. Surely the Supreme Court's pronouncements, viewed in their entirety, have not suggested such a restrictive approach.[15] In my opinion, the Court looks at historical antecedents not because there is something magical about immunity law circa 1871, but because what we call a "legal tradition" often develops precisely because the rule of law at the root of the tradition furthers societal values that we continue to find compelling today.[16] The Supreme Court's pronouncements on immunities law in the section 1983 context, I submit, show an interest not in slavishly following common law immunity doctrines,[17] but in preserving the balance of interests that those doctrines struck.
 
 
 44
 The point I wish to make is simply that the development of immunity law in the section 1983 context should ultimately be viewed as the result of the same kind of remedial decisionmaking that federal courts perform in Bivens cases. Federal courts have inherent power to fashion remedies for constitutional violations,[18] and they have an obligation to make those remedies fair--fair not only from the perspective of the aggrieved party, but also from the perspective of the defendant and society as a whole. As the Supreme Court has observed,
 
 
 45
 official immunity apparently rested, in its genesis, on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.
 
 
 46
 Scheuer v. Rhodes, 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974) (footnote omitted).
 
 
 47
 In developing immunities, then, we necessarily engage in what is principally a policy determination. In my view, the policy determination the majority reaches in this case is a well considered one, and I would therefore concur in it.
 
 VANCE, Circuit Judge, dissenting:
 
 48
 Nothing divides this court like a section 1983 case. Although I join Judge Johnson's dissent, I write separately to lament the sorry state of the law under section 1983 that the fragmented decisions of this and the Supreme Court reflect.[1]
 
 I.
 
 49
 I respectfully disagree with the plurality's opinion that the private defendants in this case are entitled to qualified immunity. I believe that the plurality is wrong in even considering the issue of qualified immunity for private defendants under section 1983. I am particularly concerned because much of the case law under section 1983 is confused or misguided, and no longer corresponds to the reasons Congress enacted section 1983 in the first place.
 
 
 50
 The present law under section 1983 requires that federal courts inquire into the existence of municipal policies and customs, determine whether there has been a violation of the federal constitution by evaluating the adequacy of state remedies, and decide whether or not the ancient doctrine of the infallibility of kings extends to middle-level public officials and private parties in a twentieth century democracy. These seem to me to be the wrong questions to ask about a civil rights statute enacted to enforce the provisions of the fourteenth amendment. See Monell v. Department of Social Servs., 436 U.S. 658, 665, 98 S.Ct. 2018, 2023, 56 L.Ed.2d 611 (1978); Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961). Instead, I believe we should ask what kinds of constitutional wrongs Congress designed section 1983 to reach, and decide for which constitutional wrongs section 1983 should provide a federal remedy.
 
 II.
 
 51
 I understand the need to corral the explosion of cases brought into federal court under section 1983. Certainly not every prisoner case involving a negligently lost hobby kit or a neglected pillow belongs in federal court. Responding to the vast increase in these types of section 1983 cases, the Supreme Court, in a series of result-oriented decisions, has developed several approaches and doctrines designed to restrict the scope of section 1983. Although these cases have barred certain kinds of actions previously brought under section 1983, I believe that they have failed to limit the scope of section 1983 to the appropriate situations.
 
 A.
 
 52
 The attempts to restrict section 1983 have centered generally on how to distinguish between causes of action "commonly thought to state a claim for a common-law tort normally dealt with by state courts," Parratt v. Taylor, 451 U.S. 527, 533, 101 S.Ct. 1908, 1911, 68 L.Ed.2d 420 (1981), and those that rise "to the level of constitutional tort." Jackson v. City of Joliet, 465 U.S. 1049, 1051, 104 S.Ct. 1325, 1325, 79 L.Ed.2d 720 (1984) (White, J., dissenting from denial of certiorari). Courts and scholars have labored to distinguish constitutional tort actions, worthy of a federal forum, from ordinary tort actions couched in constitutional terms, which do not belong in federal court. Bandes, Monell, Parratt, Daniels, and Davidson: Distinguishing a Custom or Policy from a Random, Unauthorized Act, 72 Iowa L.Rev. 101, 102 (1986).
 
 
 53
 One attempt to make this distinction borrows from tort law the concepts of mere negligence, gross negligence and intent, and tries to distinguish constitutional torts from ordinary torts on the basis of the culpability of the actors. Early decisions of the former Fifth Circuit wrestled with this approach. See, e.g., York v. City of Cedartown, 648 F.2d 231, 232-33 (5th Cir. Unit B 1981) (facts do not support claims of negligence and nuisance and therefore do not rise to an "abuse of governmental power" required to raise an ordinary tort claim to the level of a constitutional violation); Jones v. Diamond, 636 F.2d 1364, 1380-81 (5th Cir.1981) (in banc) (had individual claims been presented under section 1983, it would have been necessary to examine the nature of the right asserted, apply standards for liability under section 1983, and afford defendants an opportunity to plead official immunity), cert. dismissed, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); Williams v. Kelley, 624 F.2d 695, 697-98 (5th Cir.1980) (question of whether defendants' conduct was "sufficiently egregious as to be 'constitutionally' tortious" is resolved by looking to principles of official immunity, and negligence is not enough), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981); Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir. Unit A Jan. 1981) (determining when physical tort amounts to a section 1983 action involves inquiry into the amount of force used compared to the need presented, the extent of injury inflicted and the motives of the state officer).
 
 
 54
 The issue of what standard of care applies to section 1983 actions has remained a major theme. The Supreme Court repeatedly has addressed the issue of whether mere negligence will support a claim for relief under section 1983, or whether some higher standard is required. See Parratt, 451 U.S. at 532-33, 101 S.Ct. at 1911-12; see also Rizzo v. Goode, 423 U.S. 362, 385 & n. 2, 96 S.Ct. 598, 611 & n. 2, 46 L.Ed.2d 561 (1976) (Blackmun, J., dissenting) (raising but not resolving the issue of whether negligent failure to supervise will support a section 1983 action for damages). The Supreme Court has resolved the issue only partially, by holding in the Parratt line of cases that negligent acts of officials that cause unintentional losses do not amount to procedural due process violations, and hence are not actionable under section 1983. See Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). Other standard of care issues under section 1983 have never been resolved by the Supreme Court, See Daniels, 106 S.Ct. at 667 n. 3; see also Gilmere v. City of Atlanta, 774 F.2d 1495, 1503-04 & nn. 8, 9 (11th Cir.1985) (there exists substantial disagreement as to whether gross negligence can suffice under section 1983 to establish municipal liability).
 
 
 55
 In any event, this approach has never been satisfactory. Although the Supreme Court has written that "the difference between one end of the spectrum--negligence--and the other--intent--is abundantly clear," Daniels, 106 S.Ct. at 667, the middle of the spectrum is not so clear. Id.; cf. Davidson, 106 S.Ct. at 675 (Blackmun, J., dissenting) (finding that recklessness is sufficient and doubting the district court's conclusion that the prison officials were not reckless). Even if the lines were clear, I do not believe that culpability quantification serves to differentiate constitutional torts from ordinary torts in a meaningful way. Determining whether, for example, a standard automobile collision case belongs in state or federal court on the basis of whether the driver was negligent or reckless does not strike me as a good way to think about the problem. I believe therefore that this approach is unfit for analyzing section 1983 actions.
 
 B.
 
 56
 The Supreme Court also has attempted to curb the abuse of section 1983 by exploring the contours of municipal liability under the statute. In Monell, the very case that exposed municipalities to section 1983 liability by reversing the contrary holding of Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), the Supreme Court introduced the "policy or custom" test for determining under what circumstances a municipality can be sued under section 1983. Ten years later, the Supreme Court is still struggling with this approach, and the lower federal courts have been left with the nearly impossible task of determining what kinds of government actions amount to a policy or custom.
 
 
 57
 The Supreme Court held in Monell that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Sec. 1983." 436 U.S. at 694, 98 S.Ct. at 2037. The obvious problem with this test is the word "fairly," and the inherent vagueness of the terms "policy" and "custom." Justice Powell recognized in Monell that there were "substantial line-drawing problems in determining 'when execution of government's policy or custom' can be said to inflict constitutional injury such that 'government as an entity is responsible under Sec. 1983.' " 436 U.S. at 713, 98 S.Ct. at 2047 (Powell, J., concurring).[2]
 
 
 58
 Despite many efforts by the Supreme Court, I believe that these intractable line-drawing problems have never been surmounted, and indeed may be unsolvable. I find the concept of requiring an official policy to be "the moving force" behind a constitutional violation to be particularly difficult. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1985); Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); Monell 436 U.S. at 694, 98 S.Ct. at 2037. The Monell doctrine also has proven to be particularly unsuitable to cases involving "isolated acts by government officials and employees." City of St. Louis v. Praprotnik, --- U.S. ----, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (plurality opinion); see Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); Tuttle, 105 S.Ct. 2427 (1985). In this context the Monell policy or custom approach has generated such inquiries as "whether a policymaker's 'gross negligence' in establishing police training practices [can] establish a 'policy' that constitutes a 'moving force' behind subsequent unconstitutional conduct, or whether a more conscious decision on the part of the policymaker [is] required." Tuttle, 105 S.Ct. at 2436 n. 7.
 
 
 59
 These kinds of inquiries have carried the law of section 1983 far from the purpose of that statute. As Justice Stevens has noted, "the issue has apparently become, not the purpose and scope of 42 U.S.C. Sec. 1983, but the nature of the liability 'envisioned' by this court 'in Monell.' " Pembaur, 106 S.Ct. at 1302 n. 1 (Stevens, J., concurring in part and concurring in the judgment) (quoting id. at 1304 (O'Connor, J., concurring in part and concurring in the judgment)). The word "policy" does not appear in the text of section 1983, 106 S.Ct. at 1302 (Stevens, J., concurring in part and concurring in the judgment), and I do not believe Congress had a municipal policy requirement in mind when it enacted section 1983.
 
 
 60
 The policy or custom approach thus has been unsuccessful in serving as a proper limit on the scope of section 1983. I cannot agree with the statement in Justice Brennan's opinion in Tuttle that "[s]ince Monell, of course, the contours of municipal liability have become substantially clearer." Tuttle, 105 S.Ct. at 2437 n. 1 (Brennan, J., concurring in part and concurring in the judgment). Nor can I agree with the statement by the Tuttle majority that although the Supreme Court "has decided a host of cases under [section 1983] in recent years, it can never hurt to embark" on more statutory interpretation. Id. at 2432. I believe that the Supreme Court's statutory interpretation of section 1983 has hurt, by generating a great deal of confusing litigation and doctrinal turmoil. Rather than refining these principles, as the Supreme Court has indicated it may do in the future, see Praprotnik, 108 S.Ct. at 926 (plurality opinion), I hope that the Court will choose to abandon the Monell policy or custom approach.
 
 C.
 
 61
 Faced with the possibility of section 1983 extending all the way out to an accidental twenty-three dollar property loss case, the Supreme Court in 1981 put its "shoulder to the wheel" once again to help delineate between constitutional torts and ordinary torts. Parratt v. Taylor, 451 U.S. 527, 533-34, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Although the Court held that negligence will support a cause of action under section 1983, id. at 536-37, 101 S.Ct. at 1913-14,[3] the Court also held that there is no procedural due process violation under the fourteenth amendment if the state provides a constitutionally adequate remedy for the negligent property deprivation. Id. at 537-44, 101 S.Ct. at 1913-17.
 
 
 62
 The decision was clearly a reaction to the concerns noted by Justice Powell in his dissent: "The present case, involving a $23 loss, illustrates the extent to which constitutional law has been trivialized, and federal courts often have been converted into small-claims tribunals." Id. at 554 n. 13, 101 S.Ct. at 1922 n. 13 (Powell, J., concurring in the result). I am entirely sympathetic to these concerns. The effort, however, in Parratt and subsequent cases to address these concerns by considering the adequacy of state law remedies is wholly unwarranted and unrelated to the reasons Congress enacted section 1983.
 
 
 63
 Congress assumed the availability of state remedies when it enacted the Civil Rights Act of 1871.
 
 
 64
 [T]he legislative history of Sec. 1983's predecessor makes clear that Congress intended to alter the federal-state relationship with respect to the protection of federal rights. "The very purpose of Sec. 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights." Mitchum v. Foster, 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). In particular, Congress intended "to provide a federal remedy where the state remedy ... was not available in practice." Monroe v. Pape, 365 U.S., at 174, 81 S.Ct., at 477.
 
 
 65
 Davidson, 106 S.Ct. at 676 (Blackmun, J., dissenting) (emphasis added). There were state law remedies on the books when Congress enacted section 1983. Congress was not attempting to fill gaps in these state remedies. Rather, Congress intended to provide a federal remedy for constitutional deprivations, regardless of what state law provided.
 
 
 66
 The existence of a state remedy is irrelevant in determining what kinds of wrongs section 1983 should redress. As Justice Blackmun recognized in his opinion in Parratt: "The mere availability of a subsequent tort remedy before tribunals of the same authority that, [through] its employees, deliberately inflicted the harm complained of, might well not provide the due process of which the Fourteenth Amendment speaks." 451 U.S. at 546, 101 S.Ct. at 1918 (Blackmun, J., concurring); see also Logan v. Zimmerman Brush Co., 455 U.S. 422, 436-37, 102 S.Ct. 1148, 1158-59, 71 L.Ed.2d 265 (1982) (post-deprivation remedy is constitutionally inadequate where the only process comes in the form of an independent tort action).[4]
 
 
 67
 I recognize that the Parratt doctrine applies primarily to procedural due process claims, and not to substantive due process and most other kinds of constitutional claims brought under section 1983.[5] See Burch v. Apalachee Community Mental Health Services, 840 F.2d 797, 803 (11th Cir.1988) (Johnson, Circuit Judge, specially concurring); Gilmere, 774 F.2d at 1499-1500. Nevertheless, I believe that the introduction of the adequacy of state remedies into section 1983 analysis, even primarily limited to procedural due process violations, conflicts with the purposes of section 1983. "Conduct that is wrongful under Sec. 1983 surely cannot be immunized by state law." Davidson, 106 S.Ct. at 676 (Blackmun, J., dissenting). I believe that the Supreme Court should reevaluate the applicability of the Parratt doctrine to section 1983.
 
 D.
 
 68
 A fourth major assault on the expansion of section 1983 involves the issue of immunity for government officials. Although the Supreme Court has held that municipalities have no immunity from damages liability flowing from constitutional violations under section 1983, Owen v. City of Independence, 445 U.S. 622, 657, 100 S.Ct. 1398, 1418, 63 L.Ed.2d 673 (1980), the Court has held that many government officials do have some kind of immunity. See, e.g., Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (federal law enforcement officers conducting unconstitutional searches have good faith immunity); Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (judges have absolute immunity from suits for damages, but no immunity from suits for injunctive relief); Briscoe v. Lahue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (police officers giving perjured testimony have absolute immunity); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (presidential aides have good faith immunity); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors acting in official capacity have absolute immunity); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (school officials have good faith immunity); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (governors have good faith immunity).
 
 
 69
 The historical principle of sovereign immunity, the "somewhat arid fountainhead for municipal immunity," Owen, 445 U.S. at 645, 100 S.Ct. at 1412, "stems from the personal immunity of the English Monarch as expressed in the maxim, 'The king can do no wrong.' " Id. at 645 n. 28, 100 S.Ct. at 1412 n. 28; see Duncan v. Peck, 844 F.2d 1261, 1264 (6th Cir.1988); see also Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes, 336 F.2d 354, 357 (2d Cir.1964) (doctrine of sovereign immunity "originated in an era of personal sovereignty, when kings could theoretically do no wrong"), cert. denied, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). This rationale for governmental immunity obviously has no relevance today. The Supreme Court, however, has analyzed contemporary immunity issues on the assumption that common law principles of immunity have been incorporated into our judicial system absent clear legislative intent to the contrary. Pulliam, 466 U.S. at 529, 104 S.Ct. at 1974. Thus whether absolute or good faith immunity under section 1983 extends to a particular governmental unit or official depends on the state of the common law in 1871 when Congress enacted the statute. See id. at 529-36, 104 S.Ct. at 1974-78; Owen, 445 U.S. at 635-47, 100 S.Ct. at 1407-13.
 
 
 70
 It is debatable whether trying to divine the common law as it existed in the various states over a century ago is a good approach. See, e.g., Anderson, 107 S.Ct. at 3041 ("we have never suggested that the precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law"); Smith v. Wade, 461 U.S. 30, 93, 103 S.Ct. 1625, 1659, 75 L.Ed.2d 632 (1983) (O'Connor, J., dissenting) ("the battle of string citations can have no winner"). In any event, lacking Congressional guidance, it is clear that courts have created governmental immunities where there exist sound policy reasons to do so. See Harlow, 457 U.S. at 813 n. 20, 102 S.Ct. at 2735 n. 20; Nixon v. Fitzgerald, 457 U.S. 731, 748, 102 S.Ct. 2690, 2700, 73 L.Ed.2d 349 (1982); Owen, 445 U.S. at 637, 100 S.Ct. at 1408.
 
 
 71
 I can see no sound policy reason to give good faith immunity to private defendants in section 1983 actions. As Judge Johnson convincingly shows in Part I of his dissenting opinion in this case, the plurality's alleged "powerful policy considerations" supporting such immunity for private individuals are irrelevant to section 1983, the statute at issue in this case. The genesis of this misguided notion of providing good faith immunity to private parties is in the last footnote of the majority opinion in Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Responding to Justice Powell's concern over private individuals who innocently make use of apparently valid state laws later held unconstitutional, Justice White wrote for the majority:
 
 
 72
 In our view ... this problem should be dealt with not by changing the character of the cause of action, but by establishing an affirmative defense. A similar concern is at least partially responsible for the availability of a good-faith defense, or qualified immunity, to state officials. We need not reach the question of the availability of such a defense to private individuals at this juncture.
 
 
 73
 Id. at 942 n. 23, 102 S.Ct. at 2756 n. 23. Whatever this passage reveals about how the Supreme Court will rule on the issue,[6] I believe that there is no valid basis in nineteenth century common law or contemporary public policy for the plurality's holding. Accord, Duncan v. Peck, 844 F.2d at 1266.
 
 
 74
 The decision to give private individuals good faith immunity under section 1983 is yet another manifestation of the underlying frustration federal courts have felt about section 1983 in the last decade or so. Once again, I stress that I share this frustration, but the plurality's approach is simply a legally incorrect way to go about remedying the situation. Contrary to the assertions of the plurality, today's opinion comports with neither the text, the purpose, nor the general development of the law under section 1983. See ante at 1344 n. 6. (Johnson, Circuit Judge, dissenting). Extension of good faith immunity to private defendants is nothing more than a striking display of judicial activism.[7] As Judge Johnson demonstrates, "[t]here is no justification for this extension of the qualified immunity doctrine." Ante at 1343 (Johnson, Circuit Judge, dissenting). The plurality asks a bad question, and gets a bad result.
 
 III.
 
 75
 There are too many section 1983 cases in federal court that do not belong in federal court. There is now a large enough body of case law so that we understand the nature of the problem. I have not attempted to present solutions to all the inadequacies in the law under section 1983. I simply lament these inadequacies in the hope that the Supreme Court will undertake a wholesale reevaluation of current law. I believe that the Supreme Court should address these problems by developing a new framework for deciding what kinds of harms amount to constitutional torts under the statute.[8]
 
 
 76
 I believe that the issues and the result reached by the court in this case, are all wrong. I therefore respectfully dissent.
 
 
 77
 JOHNSON, Circuit Judge, dissenting, in which VANCE, KRAVITCH, HATCHETT and CLARK, Circuit Judges, join.
 
 
 78
 The majority holds that Preuit & Mauldin ("P & M") and the other private defendants in this case[1] are entitled to assert a defense of qualified immunity to Jones' damages action brought pursuant to 42 U.S.C.A. Sec. 1983. I find no justification for allowing private defendants to assert such a defense. Moreover, even assuming arguendo that a qualified immunity defense is available to some private defendants, I disagree that P & M successfully established such a defense. Accordingly, I dissent.
 
 I.
 
 79
 Both the Supreme Court and this Circuit have expressly reserved the question of whether private actors in a Section 1983 action are entitled to the qualified immunity available to state actors. Lugar v. Edmondson Oil Co., 457 U.S. 922, 942 n. 23, 102 S.Ct. 2744, 2756 n. 23, 73 L.Ed.2d 482 (1982); I.A. Durbin, Inc. v. Jefferson National Bank, 793 F.2d 1541, 1550 n. 11 (11th Cir.1986). The circuits that have addressed this issue have reached opposite conclusions. The First and Ninth Circuits have held that private actors are not entitled to qualified or "good faith" immunity, Howerton v. Gabica, 708 F.2d 380, 385 n. 10 (9th Cir.1983); Downs v. Sawtelle, 574 F.2d 1, 15-16 (1st Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978), while the Fifth and Eighth Circuits have held that such immunity for private defendants exists. Buller v. Buechler, 706 F.2d 844, 850-53 (8th Cir.1983); Folsom Investment Co. v. Moore, 681 F.2d 1032, 1037-38 (5th Cir. Unit A 1982). I believe that an examination of the immunity doctrine demonstrates that the First and Ninth Circuits are correct in holding that private defendants are not entitled to qualified immunity.
 
 
 80
 Section 1983 provides that every person who acts under color of state law to deprive another person of a constitutional right shall be liable to that person for damages.[2] On its face, Section 1983 "admits of no immunities." Imbler v. Pachtman, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). Nonetheless, the Supreme Court has reasoned that in enacting Section 1983, Congress did not intend to supplant traditional immunities embedded in the common law. Therefore, if an immunity was firmly established in the common law when Congress enacted Section 1983 and if strong policy reasons support its continued use, the immunity is available under Section 1983. Owen v. City of Independence, 445 U.S. 622, 637-38, 100 S.Ct. 1398, 1408-09, 63 L.Ed.2d 673 (1980); Pierson v. Ray, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 1217-18, 18 L.Ed.2d 288 (1967). However, courts cannot engraft new immunities onto the statute. Tower v. Glover, 467 U.S. 914, 922-23, 104 S.Ct. 2820, 2825-26, 81 L.Ed.2d 758 (1984). Nor can courts recognize traditional immunities that eviscerate the policies of Section 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 258-59, 101 S.Ct. 2748, 2755-56, 69 L.Ed.2d 616 (1981). Rather, Section 1983 immunity is "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." Owen, 445 U.S. at 638, 100 S.Ct. at 1409 (quoting Imbler, 424 U.S. at 421, 96 S.Ct. at 990).
 
 
 81
 The majority identifies no immunity that P & M would have enjoyed at common law. Instead, it argues that, at the time of Section 1983's enactment, the common law recognized a defense of "good faith and probable cause" to tort actions brought for wrongful attachment or malicious prosecution. Citing Wood v. Strickland, 420 U.S. 308, 318-19, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975), and Pierson, 386 U.S. at 555-57, 87 S.Ct. at 1218-19, the majority asserts that the Supreme Court has held that the existence of a common law defense of good faith and probable cause supports the availability of qualified immunity under Section 1983. Maj. op. at 1324. However, Wood extended qualified immunity to school board members because of common law tradition and "strong public policy reasons." 420 U.S. at 318, 95 S.Ct. at 999. The policy rationale for extending qualified immunity to these state officials was that, in the school disciplinary process, school board members functioned "in the nature of legislators and adjudicators."[3] Id. at 319, 95 S.Ct. at 999. Because "[e]ach of these functions necessarily involves the exercise of discretion, the weighing of many factors and the formulation of long-term policy," id., the Wood Court concluded that school board members were entitled to qualified immunity. See id. at 319-21, 95 S.Ct. at 999-1000. In addition, the Court noted that, if school board members did not have qualified immunity, they would be deterred from acting forcefully and decisively in the long-term interest of the schools. Id. at 319-20, 95 S.Ct. at 999-1000.
 
 
 82
 None of these factors is present in the case at bar. Unlike public officials, private defendants do not exercise official discretion, nor do they formulate policy. Public officials receive qualified immunity so that they will not be deterred from exercising the discretion accorded them, and so that able citizens will not be deterred from accepting public office. Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982); Wood, 420 U.S. at 319-20, 95 S.Ct. at 999-1000. Qualified immunity serves the additional public purposes of encouraging the vigorous exercise of public authority while shielding officials from undue interference with their duties. Harlow, 457 U.S. at 806-07, 102 S.Ct. at 2731-32; Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978). In short, qualified immunity is intended to protect the public office as opposed to the public officer. See Harlow, 457 U.S. at 814, 102 S.Ct. at 2736. Cf. Sparks v. Duval County Ranch Co., 604 F.2d 976, 979 (5th Cir.1979) (en banc) ("absolute immunity that judges enjoy exists for the benefit of the judicial system and of the public, not for that of the judge"), aff'd sub nom. Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).
 
 
 83
 Despite the fact that the defendants in this case do not occupy public office and are not accorded any public discretion or policy-making authority, the majority concludes that they are entitled to qualified immunity. There is no justification for this extension of the qualified immunity doctrine. "Private parties simply are not confronted with the pressures of office, the often split-second decisionmaking or the constant threat of liability facing public officers, governors and other public officials." Downs, 574 F.2d at 15.
 
 
 84
 Because none of the policy considerations which support the qualified immunity doctrine is present in this case, the majority creates its own policy rationale for providing private actors with qualified immunity. It argues that citizens should not be exposed to liability based on their use of a state statutory attachment procedure.[4] While the simplicity of this suggestion may be appealing, the majority errs by proposing its own policy justification for extending qualified immunity to private defendants. See id. at 15-16. ("Whatever factors of policy and fairness militate in favor of extending some immunity to private parties acting in concert with state officials were resolved by Congress in favor of those who claim a deprivation of rights.")
 
 
 85
 The Supreme Court has prohibited the mode of judicial policy-making adopted by the majority. The Court has said, "We do not have a license to establish immunities from Sec. 1983 actions in the interests of what we judge to be sound public policy. It is for Congress to determine whether Sec. 1983 litigation has become too burdensome to state or federal institutions and, if so, what remedial action is appropriate." Tower, 467 U.S. at 922-23, 104 S.Ct. at 2825-26.[5]
 
 
 86
 Although the majority's policy arguments may be appealing in the instant case, this Court is not free to extend qualified immunity to private defendants unless the policies behind the qualified immunity doctrine would be furthered by this holding. Because no public office or official discretion is protected here, I would hold that the defendants are not entitled to qualified immunity.[6]
 
 II.
 
 87
 Even assuming arguendo that private parties should be entitled to qualified immunity in Section 1983 actions, P & M has not established its right to the defense here. Qualified immunity is not available if the defendants reasonably should have known that their conduct violated Jones' clearly established constitutional right. See Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. In this case, established precedent indicated that the attachment procedure used by P & M was unconstitutional. Nonetheless, the majority concludes that P & M did not violate clearly established constitutional rights of which a reasonable person should have known. After discussing the four major Supreme Court attachment cases, the majority asserts that P & M is entitled to good faith immunity because the defendants' actions were arguably commensurate with the safeguards required by Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). While I agree that Mitchell establishes the standard against which attachments should be measured, the attachment procedure utilized by P & M does not comport with the procedure upheld in Mitchell. Therefore, even under a qualified immunity analysis, I would hold that P & M violated Jones' clearly established constitutional rights because the attachment procedure it employed did not provide Jones with preseizure notice and a hearing.[7]
 
 
 88
 In Mitchell, the Supreme Court held that preseizure notice and a hearing were not required if the attachment procedure satisfied four requirements. These requirements include: (1) the creditor must file an affidavit setting forth the specific facts entitling him to relief; (2) the creditor must post a bond to compensate the debtor for any damages resulting from a wrongful attachment; (3) the writ of attachment can be issued only by a judge with discretion to deny the writ; and (4) the debtor must be entitled to an immediate postseizure hearing at which the creditor must prove his entitlement to the writ. All these safeguards were not present here.
 
 
 89
 First, the judge who issued the writs of attachment in the instant case was not vested with sufficient discretion to satisfy the dictates of Mitchell. Specifically, he could not inquire into the veracity of P & M's allegations made in its affidavit seeking the writs. As the majority indicates, the attachments here were obtained under Alabama's mechanic's lien statute. Alabama Code Sec. 35-11-110 creates a lien in favor of a repairman against any vehicle he repairs, and Alabama Code Sec. 35-11-111 outlines the procedures for enforcing that lien by attachment. Although Section 35-11-111 requires both the filing of an affidavit setting forth the plaintiff's entitlement to relief and the posting of a bond payable to the defendant in case of a wrongful attachment, that section does not specify who is authorized to issue the writ. Instead, it provides only that the writ is to be issued "by any officer authorized to issue such writs." Id. Therefore, in order to determine who can issue such a writ and what discretion the issuing officer possesses, resort must be had to the provisions of Alabama's general attachment statute. Those provisions authorize a circuit court judge to issue a writ of attachment. Ala.Code Sec. 6-6-43. However, nothing in those provisions authorizes a circuit court judge to go behind a creditor's allegations in order to determine their validity. In actions involving either the seizure of property under the detinue statute or the enforcement of a security interest, Ala.R.Civ.P. 64(b) mandates a judicial inquiry into the facts supporting the need for an attachment without prior notice. However, both Rule 64 and its Committee Comments indicate that the special procedures established therein apply only to actions in detinue or in enforcement of a security interest and that those procedures are in addition to the procedures required under the general attachment statute.[8] Consequently, in issuing a writ of attachment under Section 35-11-111, the circuit court judge's function is solely to determine the adequacy of the plaintiff's allegations. If the facts as alleged would entitle the plaintiff to relief, the judge must issue the writ. He cannot determine whether the allegations are in fact true.
 
 
 90
 Such limited "discretion" fails to provide the meaningful judicial participation contemplated in Mitchell. The safeguards outlined in Mitchell are a substitute for prior notice and hearing because, like preseizure notice, they protect debtors against "abuse by creditors without valid claims." 416 U.S. at 614, 94 S.Ct. at 1903. Therefore, judicial participation in issuing a writ of attachment does not provide a substitute for preseizure notice unless that participation helps "minimize the risk that the ex parte procedure will lead to a wrongful taking." Id. at 617, 94 S.Ct. at 1905. Judicial participation does not meaningfully reduce the risk of a wrongful attachment unless the judge can, if necessary, inquire into the truthfulness of the creditor's allegations. Otherwise, the judge's involvement would amount to nothing more than the very type of ministerial determination that the Supreme Court has struck down as insufficient to provide due process when performed by a clerk. See North Georgia Finishing, Inc. v. Di-Chem, 419 U.S. 601, 606-07, 95 S.Ct. 719, 722-23, 42 L.Ed.2d 751 (1975). This is not to say, however, that a judge must put every creditor to his proof or that a creditor, prior to issuance of a writ of attachment, must prove his claim by a preponderance of the evidence. Rather, the judge must possess the ability, in the exercise of his discretion, to require more proof from the creditor than the creditor's affidavit in deciding whether to issue a writ of attachment without prior notice to the debtor. For example, under certain circumstances the judge may wish to examine the documents giving rise to the creditor's interest in the property. If such proof is not forthcoming, the judge should be able to deny issuing the writ until the debtor is provided notice and an opportunity for a hearing.
 
 
 91
 The majority reads Mitchell as requiring no more from the judge than that he determine the facial sufficiency of the allegations. They base their reading on the ground that the state sequestration statute upheld in Mitchell allowed the judge to issue the writ "only when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts shown by verified petition or affidavit." 416 U.S. at 616, 94 S.Ct. at 1904. However, nothing in that statute prohibited the court from requiring additional proof. Furthermore, the Court emphasized in Mitchell that a preseizure hearing was unnecessary because the issues involved in that case--the existence of a vendor's lien and the purchaser's default--were particularly suited for documentary proof. Id. at 617-18, 94 S.Ct. at 1905-06. A claim that is amenable to documentary proof helps reduce the risk of a wrongful attachment only if the court issuing the writ can examine any supporting documents. In the instant case, the state circuit court judge had no discretion to scrutinize any documents that may have existed.
 
 
 92
 The second major safeguard which appeared in the statutory scheme in Mitchell, but which is not part of the Alabama statute, is an immediate postseizure hearing at which the debtor could challenge the attachment and require the creditor to prove the grounds for the seizure. Id. at 618, 94 S.Ct. at 1905. The Alabama statute only allows the debtor to bring a damages action on the creditor's bond. This is not the same as an immediate postseizure hearing because it does not require the creditor to prove his grounds for the attachment, and it does not provide for a method to dissolve the attachment.
 
 
 93
 In Di-Chem, the Supreme Court recognized that the immediate postseizure hearing which was available in Louisiana was a significant factor distinguishing Mitchell from Di-Chem. See Di-Chem, 419 U.S. at 607, 95 S.Ct. at 722. In the case at bar, the majority contends that Jones could have brought a common law action to dissolve the attachment; however, Di-Chem emphasized that the lack of statutory safeguard distinguished it from Mitchell. Likewise, the lack of statutory post-attachment hearing at which the creditor is required to prove his grounds for the attachment distinguishes the Alabama statute from the one in Mitchell.
 
 
 94
 The predecessor to this Court recognized that Mitchell and Di-Chem require the "participation of a judicial officer, specific factual allegations of entitlement, and access to an 'immediate' post-seizure hearing." Johnson v. American Credit Co. of Georgia, 581 F.2d 526, 534 n. 16 (5th Cir.1978) (citation omitted). The Alabama attachment statute does not sufficiently satisfy these requirements; therefore, P & M's attachment did not comport with due process. Because the attachment procedure used by P & M was not commensurate with the Mitchell safeguards, P & M violated Jones' clearly established constitutional rights.
 
 III.
 
 95
 The majority also affirms the district court's denial of Jones' motion for partial summary judgment on the issue of the constitutionality of the Alabama attachment statute. The majority states that Jones did not have standing to challenge the provision of the statute that authorizes a nonjudicial officer to issue a writ of attachment because a state circuit court judge issued the writ in this case. While I do not dispute the correctness of this statement of law, it amounts to a straw man. The majority fails to address Jones' arguments concerning the statute's additional shortcomings. As discussed more fully above, the statute fails to provide that the judge who issues the writ has discretion to scrutinize the creditor's allegations, and the statute does not provide for an immediate postseizure hearing at which the debtor can challenge the writ. Because the Alabama attachment statute does not include these two vital provisions, it fails to comport with the requirements of Di-Chem and Mitchell. Consequently, as the district court held in Wiggins v. Roberts, the statute is unconstitutional. I would therefore hold that the district court abused its discretion in failing to grant Jones' motion for partial summary judgment.
 
 IV.
 
 96
 In sum, I believe that the majority exceeds this Court's role by extending qualified immunity to private defendants based on the majority's view of the appropriate policy considerations. Moreover, policy aside, good faith immunity for P & M is not warranted by the facts of this case. Therefore, I would reverse the district court's order granting summary judgment to the defendants.[9] Because the Alabama attachment statute is unconstitutional, I would also reverse the portion of the district court's order denying Jones' motion for partial summary judgment.
 
 
 
 [1]
 The involuntary plaintiffs were Dan Gilchrist, Jr., an individual, the Small Business Administration, a federal agency, and the Citizens Bank, an Alabama bank. The Small Business Administration was never served and did not take part in the state court action
 
 
 [2]
 On the day of the attachment, Jones contacted and conferred with his lawyer, J.G. Speake, whose firm also represented Citizens Bank, which filed the motion for dissolution. This relationship is discussed further at infra n. 5
 
 
 [3]
 In this case Jones challenges only the prejudgment attachment procedures. It is clear that the attachment mechanism became inconsequential on May 19, 1982. As of that date, as between Jones and P & M, the equipment was subject to levy and sale to satisfy the judgment of the circuit court, and P & M no longer needed to rely upon the prejudgment attachment provisions
 
 
 [4]
 Citizens Bank appealed this decision to the Alabama Court of Civil Appeals, which agreed with the bank's position that it had a superior interest in the farming equipment. The court reversed the county court's denial of the Bank's motion to dissolve the writs of attachment. See Citizens Bank v. Preuit Estate, 425 So.2d 470 (Ala.Civ.App.1982)
 
 
 [5]
 In filing this motion, Jones was counseled by J.G. Speake of Speake, Speake and Reich of Moulton, Alabama. A.P. Reich of that same firm represented Citizens Bank. The record suggests that Citizens Bank may have been attempting to effectuate the favorable decision of the Court of Civil Appeals by standing aside while the motion was filed on behalf of Jones. The bank was unable to effectuate the decision more directly because it had failed to file a bond to stay the circuit court judgment and sale of the cotton pickers pending the appeal. The Supreme Court of Alabama ultimately held that the sale of the cotton pickers could not be the basis of a damage action by the bank because of its failure to stay the sale. See Citizens Bank v. Mauldin, 476 So.2d 103 (Ala.1985)
 
 
 [6]
 Jones' state court proceedings concluded with no evidence on the record which would call into doubt his indebtedness to P & M, the existence of P & M's mechanic's liens, or P & M's right to satisfy Jones' debt with the three cotton pickers
 
 
 [7]
 The Supreme Court viewed the question in terms of a choice between providing defendants with a good faith defense and incorporating a requirement of bad faith as an element of the plaintiff's claim. The court expressed a preference in favor of establishing good faith as a defense. Lugar, 457 U.S. at 942 n. 23, 102 S.Ct. at 2756 n. 23. When good faith is posited as an affirmative defense, of course, the burden of proof is on the defendant rather than on the plaintiff
 
 
 [8]
 Judge Tjoflat's special concurrence provides a thorough analysis of the foundation for the courts' authority to establish and define immunities. Because the Supreme Court in Owen and Pierson has provided an analysis through which qualified immunity may be derived in the present case, we do not undertake the more fundamental analysis in this opinion
 
 
 [9]
 Our conclusion that qualified immunity is available to private defendants in this context is supported by the Supreme court's discussion of the issue in Lugar. In response to Justice Powell's concern that private individuals might be held liable for innocently relying upon state laws, the court stated: "[i]n our view, however, this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense. A similar concern is at least partially responsible for the availability of the good-faith defense, or qualified immunity, to state officials." Lugar, 457 U.S. at 942 n. 23, 102 S.Ct. at 2756 n. 23. While the court did not decide the question of whether qualified immunity is available to private defendants, the implication is strong
 
 
 [10]
 It is important to note that nothing in the Supreme Court's opinion in Mitchell required that the judge issuing the writ have the authority to determine the veracity of the creditor's allegations. Under the Louisiana statute upheld in Mitchell, the judge issued the writ "if the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appeared from specific facts shown by verified petition or affidavit." Id. at 616. Our reading of Mitchell requires that the issuing judge be convinced that if what the creditor alleges is true, the creditor is entitled to a writ of attachment. The judge must have the authority to make sure that the affidavit alleges the necessary grounds for issuing the writ. Requiring any further investigation at that point would vitiate Mitchell and essentially require a preseizure hearing in every case, which is plainly not required. Further, as in Mitchell where the attachment was based on a vendor's lien, the specific facts necessary to establish grounds for a mechanic's lien are easily established by documentary proof, thus decreasing the likelihood that a seizure will prove to have been a mistake. See Mitchell, 416 U.S. at 612, 94 S.Ct. at 1902
 
 
 [11]
 While appellant disputes that Alabama law provides a reasonably prompt opportunity to challenge the attachment, the facts of this case are to the contrary. On the day of attachment, April 8, 1982, two of the involuntary plaintiffs filed a motion to dissolve the attachments and requested a hearing. Jones was certainly entitled to do the same. As stated, he was apparently counselled by the same law firm that filed the dissolution motion on behalf of the Citizens Bank. He could not have been unaware of the opportunity to take such action. While the hearing on the involuntary plaintiffs' motion was not held for approximately two months, the delay may be attributed to the fact that the involuntary plaintiffs had little reason to push for the prompt release of equipment which was safely held by the sheriff. We also note that a portion of the delay was caused by a death in the family of one of the attorneys involved in the case. The statute upheld in Mitchell provided no time frame within which a dissolution hearing was to be held, and the actual post-seizure hearing in that case was held more than five weeks after the writ was issued. See Mitchell, 416 U.S. at 602-603, 622, 94 S.Ct. at 1897-1898, 1907. P & M could reasonably have believed that Alabama law was at least as generous as the Louisiana statute with respect to this post-seizure remedy
 
 
 [12]
 Given our disposition of the case, we need not address P & M's arguments regarding waiver, res judicata, and respondeat superior. It is just as well that we need not address the res judicata issue. The record regarding Jones' and Citizens Bank's state court proceedings is confusing and apparently incomplete. While Citizens Bank appealed the denial of its motion to dissolve the attachments, it is not clear whether Jones took an appeal when his motion was denied. Sometime after Jones' motion was denied, the Supreme Court of Alabama issued an opinion in the Citizens Bank case, and, as noted above, see supra n. 5, the record indicates that there was a close relationship between the bank and Jones in the state proceedings. Thus, it is unclear which issues were litigated and resolved on behalf of which party in the various Alabama courts. We would certainly be hard put to accurately assess the res judicata issues given this record
 Jones also claims that an employee of P & M attempted to "rig" the judicial sale which was ultimately held after P & M obtained a default judgment against Jones. This claim, however, suffers from a fatal flaw. Lugar clearly states that a private party may be liable under section 1983 only if he acts in concert with state officials or acts pursuant to, or under color of, state law. 457 U.S. at 937, 102 S.Ct. at 2753. Jones fails to allege collusion with any state official overseeing the sale and does not assert that the P & M employee who allegedly rigged the sale was acting under color of state law. Thus, the district court properly dismissed this claim.
 
 
 [13]
 This section reads:
 Sec. 6-6-43. By whom issued.
 In the first and second cases mentioned in section 6-6-41 [where a defendant lives out of state or absconds] an attachment may be issued by any judge of the circuit court, returnable to any county in the state, or by the clerk of the circuit court, judge of probate or any district court judge, within their respective counties; in the third and fourth cases, only by a judge of the circuit court or judge of probate, returnable to any county.
 
 
 [14]
 Under Alabama code Sec. 6-6-143 a judge must permit the plaintiff to amend any defect of form or substance in an affidavit, bond, or attachment. However, we have not discovered any Alabama law which indicates that the reviewing court must allow a questionable writ to go forward. Thus, we conclude that Alabama law does not suffer from the same flaw which rendered the Georgia attachment statute unconstitutional in Johnson. In Georgia, a judge, magistrate, justice of the peace, or clerk of any court of record, when presented with a creditor's affidavit and bond, had the "duty" to issue an attachment against the defendant. Johnson, 581 F.2d at 534. We find nothing in Alabama law to indicate that the issuing officer's discretion is so limited
 
 
 [15]
 Jones also intimates that the Alabama statute is unconstitutional because it allows seizure without a showing that the property to be seized is in imminent danger of destruction. However, in Mitchell, the Louisiana statute which was approved as constitutional did not require that the party seeking the writ make such a showing. All that statute required was that it be "within the power" of the defendant to dissipate or move the assets sought to be seized. 416 U.S. at 623, 94 S.Ct. at 1907. Proof of imminent dissipation does not appear to be a constitutional prerequisite for attachment
 
 
 [1]
 Jones filed suit against P & M, Edward Mauldin (both in his individual capacity and in his capacity as executor of Leonard Preuit's estate), and Leonard Preuit Mauldin. Edward Mauldin is a partner of P & M, as was Leonard Preuit. Leonard Preuit Mauldin is an employee of P & M
 
 
 [2]
 In Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court held that private actors who invoked a presumptively valid attachment statute were "state actors" liable to suit under section 1983. In Lugar, the official who authorized the writ of attachment was the clerk of the court, not a judge exercising independent judicial discretion. Where, as in Lugar, the issuance of the writ of attachment is a purely ministerial exercise, the private party invoking the procedure effectively steps into the shoes of the state. Such is not the case when issuance of the writ is the result of an exercise of independent judicial discretion. To hold otherwise would be to hold that any time a private party invokes the judicial process to settle a private dispute, that party is potentially liable under section 1983 for any error that the presiding judge may commit. Surely neither the framers of the Constitution nor the drafters of section 1983 intended to create that kind of disincentive to the use of judicial processes
 
 
 [3]
 Section 1983 provides that
 [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
 (Emphasis added.)
 
 
 [4]
 See supra note 1
 
 
 [5]
 Applying the common law analogy, causation would run to the defendants only if the attorney played a purely ministerial, i.e., passive, role in conducting the litigation. The undisputed facts of this case show that P & M's attorney clearly did not play that kind of role
 
 
 [6]
 The result I propose is consistent with our precedent regarding respondeat superior liability in section 1983 cases. It is accepted doctrine that one cannot be held liable under section 1983 on a respondeat superior basis. See Polk County v. Dodson, 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir.1986). The defendants here merely informed the attorney that they desired to collect on the debt owed by Jones, and left it to the attorney to use his expertise in deciding how best to go about achieving that end
 Even if the defendants had specifically told the attorney to apply for the writs of attachment, I would still conclude that they could not be deemed to have caused the injury Jones allegedly suffered. The attorney, on whose expertise a layperson justifiably relies, is ultimately responsible for the particular legal path employed to achieve the client's stated goals. Cf. Model Rules of Professional Conduct Rule 2.1 (1983) (in representing client, lawyer shall exercise independent professional judgment); id. Rule 1.2(d) (lawyer shall not counsel client to engage in illegal conduct).
 
 
 [7]
 In his dissenting opinion, Judge Johnson states that the Supreme Court in Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), rejected the argument that I have put forth in this section. Post at 1347 n. 9 (Johnson, J., dissenting). Judge Johnson misstates my argument to the extent he depicts me as saying that a private party who invokes a defective attachment procedure can never be deemed to cause constitutional injury. This is not what I have said at all--that position is obviously foreclosed by Lugar. My argument is that the private party's reliance on an attorney in invoking the attachment procedure can, in some cases, break the causal link between the private party's actions and the constitutional injury
 To the extent Judge Johnson is addressing the argument I have actually made, I fail to see the basis for his statement that the Lugar Court implicitly rejected that argument. The only explanation Judge Johnson gives for his statement is a reference to Justice Powell's dissenting opinion in Lugar. It is true that Justice Powell mentions that the private party in Lugar had proceeded through an attorney in invoking the attachment procedure. Lugar, 457 U.S. at 946, 102 S.Ct. at 2758 (Powell, J., dissenting). However, I see no suggestion in either Justice Powell's dissenting opinion or in Justice White's majority opinion that the district court in that case, like the district court here, made a finding as to precisely what role the attorney played. As I have indicated, my analysis would not apply where the attorney played a passive or purely ministerial role. See supra note 5. It may very well be that the attorney in Lugar played such a role; the point is that we simply do not know. Since the Lugar majority does not mention the issue, even tangentially, we must assume that the parties did not raise it. Surely we cannot be foreclosed by Lugar from considering an issue that was not before the Court.
 Contrary to Judge Johnson's suggestion, the Lugar Court did not hold that traditional section 1983 notions of causation are inapplicable in the case where a private party invokes an attachment procedure. Indeed, the Court's conclusion that such a party may be deemed a "state actor" for purposes of section 1983 liability is essentially a statement about causation. See Lugar, 457 U.S. at 937, 102 S.Ct. at 2754 (one may be a state actor "because he is a state official, because he acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State"). The issue I address in this opinion is an issue that the Supreme Court simply did not address in Lugar: under what circumstances may this causal relationship be broken? As I have stated, see supra note 6, I believe that my resolution of this issue on the facts of this case is wholly consistent with our precedent and the Supreme Court's precedent regarding causation analysis in the section 1983 context.
 
 
 [8]
 See supra note 2 and accompanying text
 
 
 [9]
 See supra note 5 and accompanying text
 
 
 [10]
 Otherwise, we would be asking whether merely eliciting the aid of an attorney violates an adversary's constitutional rights. I hardly think that it does
 
 
 [11]
 The recognition of absolute immunity for the President of the United States may be viewed as an exception to this general observation. See Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (relying heavily on separation of powers analysis)
 
 
 [12]
 The existence of this general power is illustrated by the wide range of nonstatutory remedies that have been recognized over the years as means for redressing violations of the Constitution by state and federal officials. See, e.g., United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882) (ejectment action against federal officials to enforce fifth amendment takings clause); Wiley v. Sinkler, 179 U.S. 58, 64-65, 21 S.Ct. 17, 20, 45 L.Ed. 84 (1900) (damages action against state official for denying plaintiff's right to vote in federal election); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (injunctive relief against state official for violation of fourteenth amendment); Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914) (exclusion in federal criminal case of evidence seized in violation of fourth amendment); Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 27, 78 L.Ed. 142 (1933) (damages action under fifth amendment takings clause); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1275-76, 28 L.Ed.2d 554 (1971) (busing as remedy for unconstitutional segregation in public schools)
 
 
 [13]
 The Supreme Court has held that a variety of state officials are immune from damages under section 1983. See Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (absolute immunity for legislators); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (absolute immunity for judges and qualified immunity for police officers); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (qualified immunity for state governor, president of state university, and officers and members of state National Guard); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (qualified immunity for local school administrators and school board members); O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (qualified immunity for superintendent of state hospital); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (absolute immunity for prosecutors); Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (absolute immunity for witnesses); cf. Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (no immunity for municipality based on the good faith of its officers); Tower v. Glover, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984) (no immunity for state public defenders from liability for intentional misconduct)
 
 
 [14]
 It is noteworthy in this regard that the immunities recognized in Bivens cases are coextensive with the immunities recognized in section 1983 cases. See Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)
 
 
 [15]
 In some cases, the Supreme Court does seem to be strongly embracing a restrictive approach based on the fiction that section 1983 incorporates common law immunities existing in 1871. See, e.g., Tower v. Glover, 467 U.S. 914, 920-23, 104 S.Ct. 2820, 2825-26, 81 L.Ed.2d 758 (1984). In fact, the Court frequently repeats the statement that the question of immunities is "one essentially of statutory construction." Wood v. Strickland, 420 U.S. 308, 316, 95 S.Ct. 992, 998, 43 L.Ed.2d 214 (1975). However, even in cases where the Court finds no common law antecedent existing in 1871, it goes on to inquire whether post-1871 common law cases embrace the immunity at issue. See Tower, 467 U.S. at 922, 104 S.Ct. at 2825 (finding no 1871 precedent for holding public defenders immune for intentional misconduct, but then discussing whether any modern common law jurisdiction has embraced such an immunity). In Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Court recognized absolute immunity for state prosecutors, even though the "first American case" to address the general issue of prosecutorial immunity to suit was an Indiana case decided in 1896. See id. at 421, 96 S.Ct. at 990. The Court has acknowledged that "in general our cases have followed a 'functional' approach to immunity law." Harlow v. Fitzgerald, 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982); see also Wood, 420 U.S. at 318, 95 S.Ct. at 999 ("strong public-policy reasons," as well as common law tradition, support according a qualified immunity to public school administrators). If immunity law is strictly statutory in the sense that it derives from section 1983, how do we explain the Supreme Court's holding, see supra note 14, that Bivens immunities and section 1983 immunities are coextensive?
 
 
 [16]
 In discussing general principles of damages under section 1983, the Supreme Court in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), observed that
 over the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under Sec. 1983 as well.
 Id. at 257-58, 98 S.Ct. at 1049. In a footnote to this passage, the Court noted that it "has looked to the common law of torts in a similar fashion in constructing immunities under Sec. 1983." Id. at 258 n. 13, 98 S.Ct. at 1049 n. 13. Consistent with the notion that the common law provides the "appropriate starting point" with respect to immunities, the Court has been unwilling to recognize a given immunity where it can identify no common law antecedent. See, e.g., Tower v. Glover, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984).
 
 
 [17]
 Cf. Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3041, 97 L.Ed.2d 523 (1987) ("Although it is true that we have observed that our determinations as to the scope of official immunity are made in the light of the 'common law tradition,' we have never suggested that the precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law.") (citation omitted)
 
 
 [18]
 See supra note 12 and accompanying text
 
 
 [1]
 See, e.g., Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (six opinions); Burch v. Apalachee Community Mental Health Serv., Inc., 840 F.2d 797 (11th Cir.1988) (in banc) (six opinions); Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir.1985) (in banc) (six opinions), cert. denied, 476 U.S. 1124, 106 S.Ct. 1993, 90 L.Ed.2d 654 (1986)
 
 
 [2]
 The only theory of liability ruled out by the Supreme Court in Monell was respondeat superior. Monell, 436 U.S. at 691-92 & n. 57, 98 S.Ct. at 2036 & n. 57. As later cases quickly showed, however, the Supreme Court's choice of "official policy" as the alternative to respondeat superior offered "no simple solution to the problem of delineating what is the municipality's responsibility and what is the individual employee's." Whitman, 85 Mich.L.Rev. 225, 244 (1986)
 
 
 [3]
 The Supreme Court subsequently reversed this holding in Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986). Thus the doctrine introduced in Parratt and extended to intentional deprivations of property in Hudson v. Palmer, 468 U.S. 517, 534, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984), would no longer apply to Parratt
 
 
 [4]
 The delicate balance between federal and state sovereignty would break down if litigants claiming deprivations by a governmental entity were confined to whatever redress the entity chose to provide, and were barred from an independent determination of their federal rights by a federal forum. The states would become the ultimate arbiters of the availability and scope of federal rights; a result at odds with the post-Reconstruction federalist order
 Bandes, supra, at 115 (footnotes omitted).
 
 
 [5]
 The Supreme Court has indicated that Parratt applies to section 1983 cases involving the Just Compensation Clause of the fifth amendment. See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985)
 
 
 [6]
 At least three justices in Lugar agreed with the proposition that good faith immunity for private individuals under section 1983 is a positive suggestion. See Lugar, 457 U.S. at 956 n. 14, 102 S.Ct. at 2763 n. 14 (Powell, J., dissenting)
 
 
 [7]
 The plurality opinion states:
 In the same way that we wish to encourage citizens to undertake public service, so must we encourage them to settle their differences and assert their claimed rights through the employment of legal mechanisms which they believe, in good faith, are constitutional.
 This kind of statement belongs on the floor of Congress, not in a judicial opinion. As Judge Johnson points out, the Supreme Court has prohibited precisely this kind of judicial policy-making under section 1983. See ante at 1343 & n. 5 (Johnson, Circuit Judge, dissenting).
 
 
 [8]
 One possibility is to move away from trying to define constitutional wrongs as a "particularly egregious subcategory of torts," and instead analyze section 1983 in terms of "the special problems created by the massing of power in institutions." Whitman, supra note 2, at 275. Several justices have hinted at this approach: "A deprivation must contain some element of abuse of governmental power, for the 'touchstone of due process is protection of the individual against arbitrary action of government.' " Davidson, 106 S.Ct. at 673 (Blackmun, J., dissenting) (quoting Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974))
 
 
 [1]
 Subsequent references to P & M are intended to apply to the other private defendants as well
 
 
 [2]
 Section 1983 provides in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [3]
 Legislators and judges are entitled to absolute immunity in a Section 1983 action. See Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (legislators); Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judges)
 
 
 [4]
 The majority also argues that private defendants should not be exposed to greater liability than public defendants. However, the Supreme Court rejected this argument in other contexts. For example, in Dennis v. Sparks, the Court held that a private defendant who had conspired with a judge was not entitled to immunity from damages under Section 1983 even though the co-conspirator judge was immune. 449 U.S. at 31-32, 101 S.Ct. at 188
 
 
 [5]
 Although Tower involved the question of immunity from intentional misconduct, it is instructive of the Supreme Court's approach to immunity problems. In Tower, the Court rejected policy arguments offered to justify an extension of immunity to public defenders employed by a state and county. The public defenders had argued that they were entitled to immunity because the threat of Section 1983 liability would deter public defenders from performing vital aspects of their jobs, and ultimately the state's duty to furnish criminal defendants with effective counsel would be impaired. The petitioners also predicted that the federal courts would be inundated with frivolous lawsuits. The Supreme Court responded, "Petitioners' concerns may be well founded, but the remedy petitioners urge is not for us to adopt." 467 U.S. at 922, 104 S.Ct. at 2826. A similar conclusion is required in the present case because qualified immunity for private actors is not a remedy that this Court may create
 
 
 [6]
 I disagree with the majority's suggestion that providing private citizens with qualified immunity is supported by the general development of Section 1983 law. The majority contends that prior to Lugar, the Supreme Court did not recognize that private defendants could be "state actors"; therefore, there was no need to discuss the immunity of these private actors. The implication of this statement is that qualified immunity for private actors is a natural development proceeding from Lugar. This position ignores the fact that the Supreme Court attachment cases, which were decided prior to Lugar, all implicitly held that a private creditor's invocation of an attachment statute was state action. Otherwise, the Court never would have reached the due process question at issue in those cases. See North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Sniadach v. Family Finance Corporation of Bay View, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). In fact, in Fuentes, the judgment ran against both the creditor and state officials. Although Fuentes involved only declaratory and injunctive relief, nothing in Fuentes suggested that the outcome would have been different if the debtor had asked for damages. See also Adickes v. S.H. Kress & Co., 398 U.S. 144-150-52, 90 S.Ct. 1598, 1604-06, 26 L.Ed.2d 142 (1970) (private party's joint participation with state official in a conspiracy constituted state action allowing damages under Section 1983). Lugar does not mandate the extension of qualified immunity merely because it explicitly stated that private actors were proper defendants in a Section 1983 action. This Court must still examine the policies behind the qualified immunity doctrine
 
 
 [7]
 In an unpublished opinion issued six months prior to the attachment by P & M, the Alabama attachment statute had been declared unconstitutional. Wiggins v. Roberts, No. 75-M-1760 (N.D.Ala. Aug 31, 1978) (unpublished). In that case, the district judge stated that the unconstitutionality of the statute was obvious. Subsequent to the seizure in this case, the Wiggins ruling was incorporated into an opinion concerning an application for attorneys' fees. Wiggins v. Roberts, 551 F.Supp. 57 (N.D.Ala.1982). In the second Wiggins opinion, a different district court judge noted that the first judge had found the Alabama statute clearly unconstitutional in light of Di-Chem, Mitchell, Fuentes, and Sniadach. Interestingly, the second Wiggins opinion was authored by the same district judge who ruled in this case that the unconstitutionality of the Alabama statute was not settled
 
 
 [8]
 P & M's action to enforce its mechanic's lien did not constitute either an action in detinue or an action to enforce a security interest. Therefore, P & M could not have proceeded under Rule 64(b)
 
 
 [9]
 I also observe that Judge Tjoflat's special concurrence would affirm the district court on the ground that P & M did not cause the injury suffered by Jones. Judge Tjoflat essentially argues that the unlawful attachment procedure, not P & M, deprived Jones of due process. A similar argument was presented in dissent in Lugar, 457 U.S. at 946-47, 102 S.Ct. at 2758-59 (Powell, J., dissenting). In his Lugar dissent, Justice Powell stated that a Section 1983 plaintiff had to demonstrate that the alleged unconstitutional deprivation was "caused" by a person acting under color of law. While the Lugar dissent focused on the state action issue, the causation inquiry was implicated as well. Justice Powell remarked that the state court clerk and the state sheriff had actually sequestered the property pursuant to the state attachment procedure (thereby causing the deprivation of property), but he emphasized that the debtor had not sued the state officials. Implicit in this discussion was the argument that the state officials, not the creditor, had actually caused the harm to the debtor. However, this contention did not prevail in Lugar, and Judge Tjoflat's analogous argument cannot prevail here
 Judge Tjoflat states that I have mistakenly concluded that Lugar eliminates the necessity of conducting a causation analysis. However, I do not contend that Lugar rejected traditional notions of causation in a Section 1983 action. Rather, I rely on Lugar for the proposition that a creditor who invokes a faulty state attachment procedure causes the unconstitutional deprivation. This is the principle of causation that controls the case at bar.
 In Lugar, the creditor was represented by counsel who invoked the state attachment procedure on the creditor's behalf. Neither the actions of the state officials, nor the fact that the creditor was represented by an attorney, broke the causal link between the creditor's invocation of the attachment procedure and the seizing of the debtor's property. Nonetheless, Judge Tjoflat argues that P & M did not cause Jones' injury because it hired an attorney to handle the collection of the debt, and it was allegedly unaware that the attorney would invoke the state attachment procedure. The first problem with this argument is that, even assuming that P & M's attorney acted without any direction, guidance, or assistance from P & M, Judge Tjoflat's argument is simply another version of the causation argument that did not prevail in Lugar. Lugar forecloses this argument because an attorney's actions on behalf of a client, just like the state officials' actions in carrying out the attachment, cannot break the chain of causation. Furthermore, as a policy matter, it makes no sense to allow a party to insulate itself from liability by hiring an attorney to do its bidding. The attorney in this case was clearly P & M's agent and he clearly had authority to pursue P & M's expressed goals. Therefore, Judge Tjoflat's attempt to distinguish Lugar on the basis of the activity of the attorney in the instant case is unavailing. The fact that an attorney, rather than the client, actually invoked the state attachment procedure, is simply irrelevant.
 The second problem with Judge Tjoflat's opinion is that it rests on a questionable factual basis. Judge Tjoflat assumes that P & M had no knowledge of its attorney's actions. However, two of P & M's key management personnel, Leonard Preuit Mauldin and Sherman Crisler, were closely involved in the attachment procedure with P & M's attorney. In fact, Leonard Preuit Mauldin, the son of P & M's general partner, Edward Mauldin, submitted to the state court signed affidavits for attachment of each of Jones' cotton pickers. Because Crisler and Preuit Mauldin had full authority to conduct the business of the partnership, they were, in effect, policy-makers of the partnership. Therefore, P & M is liable for their actions. Cf. Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986) (municipal liability attaches where policy-making individual directs action complained of); Bohen v. City of East Chicago, Ind., 799 F.2d 1180, 1189 (7th Cir.1986) (single act of high-ranking policy-maker is sufficient to establish official policy for which municipality may be held liable). Judge Tjoflat errs by failing to recognize this and by failing to recognize the ramifications of Lugar.